# United States Court of Appeals
## For the First Circuit

No. 23-1159

UNITED STATES OF AMERICA,

Appellee,

v.

RANDALL CRATER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Gelpí, Howard, and Rikelman,
Circuit Judges.

Scott P. Lopez, with whom Lawson & Weitzen, LLP was on brief, for appellant.

David M. Lieberman, Attorney, Criminal Division, Appellate Section, with whom Joshua S. Levy, Acting United States Attorney, Donald C. Lockhart, Appellate Chief, Christopher J. Markham, Assistant United States Attorney, District of Massachusetts, Nicole M. Argentieri, Acting Assistant Attorney General, and Lisa H. Miller, Deputy Assistant Attorney General, were on brief, for appellee.

February 23, 2024

**RIKELMAN**, <u>Circuit Judge</u>.  After an eight-day trial, a jury convicted Randall Crater of wire fraud, unlawful monetary transactions, and operating an unlicensed money transmitting business based on his involvement in a cryptocurrency scheme.  On appeal, Crater challenges two of the district court's trial rulings.  First, Crater argues that the district court violated his Sixth Amendment right to compulsory process by refusing to enforce subpoenas against three federal agency witnesses on the ground that Crater had failed to comply with the agencies' <u>Touhy</u> regulations.  Second, Crater contends that the district court abdicated its gatekeeping duty by admitting testimony from the government's cryptocurrency expert without conducting a <u>Daubert</u> hearing.  Because Crater's arguments cannot be squared with controlling precedent or the record in this case, we affirm.

## I. BACKGROUND

### A. Relevant Facts

We begin with the facts, recounted in the "light most favorable to the verdict."  <u>United States</u> v. <u>Guerrero-Narváez</u>, 29 F.4th 1, 5 (1st Cir. 2022).

In the early 2010s, interest in cryptocurrency was rapidly growing.  The first well-known cryptocurrency, Bitcoin, rose in value from less than one dollar in 2010 to nearly $100 per coin in 2013.  That same year, Randall Crater took advantage of the market by launching My Big Coin (MBC), a new virtual currency

and company. Crater credited himself as MBC's "Creator/Developer" on LinkedIn, and his colleague John Roche served as the company's chief executive officer.

MBC implicitly touted its similarities to Bitcoin on its website and social media pages. Like Bitcoin, MBC was purportedly a "virtual currency" that could be mined, bought, sold, traded, saved, donated, or "sen[t] to friends and family around the world." But MBC also claimed several unique features. First, MBC's virtual currency ostensibly was "backed 100 percent by gold." Second, MBC claimed to have a partnership with Mastercard, which would allow coin-holders to "buy stuff all over the world" using a Mastercard linked to their MBC account.

Crater also emphasized these unique features on his own social media and in communications with potential customers. On LinkedIn, he boasted that MBC was "the only cryptocurrency to be backed by gold" and that "[w]e are partners with Mastercard, which gives us a closed loop system so your [sic] able to brake [sic] down into any currency that's needed!" In an email to one customer, he wrote that "we have 300 million in gold backing us." To another, he wrote that a bank in Spain held "100 million dollars in my name in gold." Crater also told potential customers about MBC's "elite deal" with Mastercard. In one instance, he claimed via text message to have "[b]een with [the] Mastercard guys all [morning]."

These representations successfully enticed customers to purchase MBC. For example, one customer, John Lynch, invested more than $5.6 million in MBC based on his understanding that the currency "mimicked Bitcoin in many ways" but "had the additional advantage of being backed by gold."

Once customers purchased MBC, they were stuck with it. Although MBC purportedly could be sold on an exchange hosted on MBC's website, of the four MBC investors who testified for the government at trial, none were ever able to sell their coins on this exchange. Lynch, who needed liquidity to pay his taxes, tried to work with Crater to sell some of his investment outside of the exchange. Crater told Lynch that he had found a buyer and repeatedly assured Lynch that money was coming -- he claimed to be "[c]ounting cash," "waiting on the armored car service," and wiring funds from Europe -- but no sale ever materialized.

Nor could customers spend their coins via Mastercard, as Crater had promised. In lieu of a Mastercard linked to their MBC account, MBC customers received a plastic card embossed with the words "preferred customer," which provided no conduit to spend their coins. And Mastercard had no record of any proposal or deal with MBC.

Crater's representations about MBC's gold backing were also false. Crater had communicated with an individual about a "product" stored in barrels in a bonded warehouse in Texas -- but

that product was high-grade mining waste, not gold bullion. And the documentation Crater had from the warehouse at the time he represented to investors that the coin was backed by $300 million in gold said no such thing.

Customers purchased MBC by wiring money into one of three bank accounts: an account registered to Crater's other company, Greyshore Technology, or accounts registered to Crater's family members. Collectively, between 2014 and 2016, $7.8 million flowed into these three accounts, over $6.3 million of which could be traced to MBC purchases.

## B. Legal Proceedings

The government charged Crater with four counts of wire fraud under 18 U.S.C. § 1343, three counts of unlawful monetary transactions under 18 U.S.C. § 1957, and one count of operating an unlicensed money transmitting business under 18 U.S.C. § 1960(a), (b)(1)(B).

Before trial, the government advised Crater that it planned to call an expert, Pamela Clegg, a "Certified Anti-Money Laundering Specialist," to testify about virtual currencies generally and MBC specifically. Clegg worked as the Director of Financial Investigations and Education for CipherTrace, a blockchain analytics firm. In that role, she was responsible for "conduct[ing] cryptocurrency financial investigations and educat[ing] others to understand and investigate financial crimes,

money laundering and other criminal activity within the cryptocurrency ecosystem." Among the parties Clegg had educated on cryptocurrency were Interpol, Europol, and the United States Departments of Treasury, Homeland Security, and Justice.

At the government's behest, CipherTrace had conducted a "blockchain analysis" of MBC. As Clegg's expert report explained, cryptocurrencies like Bitcoin use "cryptography to validate and secure transactions that are digitally recorded on a distributed ledger" known as a "blockchain." By analyzing these public blockchains, which are "available to the public and reviewable on several platforms," an investigator can gather information about a cryptocurrency, such as transaction history and trading frequency. CipherTrace's investigation had revealed that MBC was not associated with a public blockchain and, therefore, lacked a crucial indicator of operating as a cryptocurrency, until June 2017 -- long after Crater had marketed MBC as a virtual currency comparable to Bitcoin.

Before trial, Crater moved to exclude Clegg's testimony on several grounds. He argued that Clegg was not qualified to render an expert opinion regarding cryptocurrency because her undergraduate and graduate degrees were not in computer science and that CipherTrace's investigation was based on unreliable methods. He also contended that Clegg's proposed testimony was irrelevant or, to the extent it was relevant, that the danger of

unfair prejudice substantially outweighed its probative value. Crater requested that the court hold a Daubert hearing to explore these issues.

After the government filed an opposing brief, the district court heard oral argument at the final pretrial conference on Crater's motion to exclude Clegg. Crater emphasized that Clegg's testimony risked confusing the jury because her opinion was "limited to public blockchains" and thus did not sufficiently allow for the possibility that MBC was associated with a private blockchain during the relevant time. The district court rejected this as a reason to exclude Clegg's testimony in its entirety but noted that the public versus private blockchain issue would provide Crater with "fertile ground" for cross-examination. The court also explained that, based on its review of the papers, which included Clegg's curriculum vitae, Clegg's qualifications were sufficient to render expert testimony on the relevant issues.

The case proceeded to trial, at which Crater attempted to call employees of three federal agencies -- the United States Postal Service (USPS), Commodity Futures Trading Commission (CFTC), and Federal Bureau of Investigation (FBI) -- as defense witnesses. The government maintained that the agents were not obligated to comply with Crater's subpoenas because Crater had not followed the agencies' Touhy regulations.

- 8 -

These regulations, promulgated under the federal housekeeping statute, 5 U.S.C. § 301, "govern the conditions and procedures by which [agency] employees may testify about work-related issues at trial." United States v. Soriano-Jarquin, 492 F.3d 495, 504 (4th Cir. 2007). They are known as "Touhy" regulations after the Supreme Court's decision in United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), which held that the housekeeping statute conferred upon agency heads the ability to "validly withdraw from . . . subordinates the power to release department papers" in civil proceedings. Id. at 467.

As a threshold step, before the employees would or could testify, the regulations required Crater to submit to their respective agencies a summary of the testimony he sought. 28 C.F.R. § 16.23(c) (DOJ, including FBI); 17 C.F.R. § 144.5(a) (CFTC); 39 C.F.R. § 265.12(c)(2)(iii) (USPS).[1] Crater made no attempt to comply. Instead, he argued to the district court that the agencies' regulations could not apply in criminal proceedings because their application would impermissibly burden a defendant's Sixth Amendment right to compulsory process.

---

[1] By their plain text, the USPS regulations do not apply to any proceeding in which the United States is a party. 39 C.F.R. § 265.12(a)(3)(i). For reasons we will explain, however, we do not rely upon the Touhy regulations in affirming the district court's decision and thus do not need to address this issue.

Over the course of the trial, the district court returned to the Touhy issue several times. Although the court heard oral argument on whether the regulations applied in criminal proceedings, it also invited Crater to explain why he wanted the agents to testify, indicating that the Touhy issue would be "moot" if the testimony Crater sought was irrelevant. Crater clarified that the purpose of subpoenaing the USPS and FBI agents was to question them about "how [they] conducted [the] interviews" in their investigation of Crater because, "in reading through the reports of this investigation, [he] was struck by the approach [the agents] took to questioning witnesses and essentially corrupting their recollection of what was going on." As for the CFTC agent, Crater explained that he wanted to question him about Roche's refusal to comply with a CFTC subpoena, which Crater thought could help him make out a "third-party culprit argument." The government responded that this evidence was irrelevant because Crater had not laid a foundation for it by questioning any of the testifying witnesses about their interactions with the agents.

After Crater's proffer, the district court ruled on two separate grounds that it would not compel the agents to testify. First, it concluded that declining to compel the agents' testimony would not deprive Crater of a defense because the testimony he sought was not relevant or material. At most, the court reasoned, the evidence could be used for impeachment, but given that the

- 10 -

witnesses Crater sought to impeach were not called to testify by the government, the evidence was entirely irrelevant. Second, based on out-of-circuit case law applying Touhy regulations in criminal cases, the court concluded that the agencies' regulations were operable and thus cited Crater's non-compliance as a "separate basis" for its ruling.

At the conclusion of the eight-day trial, at which Clegg testified and the CFTC, FBI, and USPS agents did not, the jury returned a guilty verdict against Crater on all counts. The district court sentenced him to 100 months' imprisonment.

## II. DISCUSSION

The issues on appeal are narrow. Crater challenges only the district court's application of the Touhy regulations in a criminal proceeding and its decision to admit Clegg's testimony without holding a Daubert hearing. Either error, he contends, requires us to vacate the final judgment and order a new trial. We review each argument de novo and conclude that neither merits reversal. See United States v. Adams, 740 F.3d 40, 43 (1st Cir. 2014) (explaining that questions of law are subject to de novo review); Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir. 2013) ("The question of whether the district court actually performed its gatekeeping function in the first place [under Daubert] is subject to de novo review.").

- 11 -

## A. The Touhy Issue

Crater argues that the district court erred by treating the agencies' Touhy regulations as valid procedural requirements in the criminal context. He maintains that enforcing these regulations in a criminal proceeding violates a criminal defendant's rights under the Sixth Amendment's Compulsory Process Clause, which provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Such restrictions on a defendant's right to call witnesses, he contends, are incompatible with the text and history of this clause.[2]

Crater premises this argument on the claim that the Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), controls our analysis. In Bruen, the Court announced the standard that courts must use to evaluate the constitutionality of regulations that burden an individual's Second Amendment right to bear arms: If the regulation at issue burdens conduct that falls within the plain text of the Second Amendment, then it is unconstitutional unless the government can

_____

[2] Crater also argues that application of the agencies' Touhy regulations violates a defendant's Sixth Amendment rights by "compel[ling] the defendant to sacrifice his work-product privilege." The parties dispute whether Crater forfeited this argument by failing to raise it in the first instance to the district court. Because our decision to affirm does not rest on the validity of the Touhy regulations, we do not need to address this argument.

prove that its regulation is "consistent with the nation's historical tradition of firearm regulation." Id. at 24. Crater argues that we must apply this same analytical framework to the regulations at issue here. And under this framework, he argues, the Touhy regulations are unconstitutional as applied to criminal proceedings.

The protections of the Compulsory Process Clause are certainly critical to an individual's constitutional right to mount a meaningful defense at trial against criminal charges brought by the government. But Crater's argument here suffers from a fundamental flaw: The Bruen decision articulated a "standard for applying the Second Amendment," id., but it did not purport to supplant existing case law on any other constitutional right. And the Supreme Court has separately interpreted the Sixth Amendment's Compulsory Process Clause. That case law, which provides an entirely different test for evaluating whether a restriction violates a defendant's right to compulsory process, necessarily controls our constitutional analysis here, regardless of whether it is consistent with the Court's mode of analysis in Bruen. See Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of

overruling its own decisions."); United States v. Ivery, 427 F.3d 69, 75 (1st Cir. 2005) ("It is not our place to anticipate the Supreme Court's reconsideration of its prior rulings . . . .").

We briefly summarize the relevant Sixth Amendment case law. The Supreme Court's decision in Washington v. Texas, 388 U.S. 14 (1967), "shaped the broad contours of the right to compulsory process." United States v. Hoffman, 832 F.2d 1299, 1302 (1st Cir. 1987). There, the Court explained that the Sixth Amendment's Compulsory Process Clause protects, "in plain terms[,] the right to present a defense." Washington, 388 U.S. at 19. It then found that a rule that arbitrarily deprived the defendant of "relevant and material" testimony, which would have been "vital" to the defense's theory, violated this constitutional right. Id. at 16, 23.

The Court "narrowed" the "lens of [the compulsory process] inquiry" in United States v. Valenzuela-Bernal, 458 U.S. 858 (1982). Hoffman, 832 F.2d at 1302. Based on Washington, the Valenzuela-Bernal Court explained that "more than the mere absence of testimony is necessary to establish a violation of the [compulsory process] right." Valenzuela-Bernal, 548 U.S. at 867. Instead, to establish a violation, a defendant "must at least make some plausible showing of how [the excluded] testimony would have been both material and favorable to his defense." Id.

After the Supreme Court articulated these principles, we incorporated them into the law of our circuit. Based on Washington and Valenzuela-Bernal, we explained, "[t]here can be no violation of the defense's right to present evidence . . . unless some contested act or omission (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the case and (4) favorable to the accused." United States v. McLellan, 959 F.3d 442, 474 (1st Cir. 2020) (second alteration in original) (quoting Hoffman, 832 F.2d at 1303).

Crater did not argue in his briefs that the district court's ruling violated his Sixth Amendment right to compulsory process under this standard. And when we offered him the opportunity to reframe his position at oral argument, he declined. Crater has therefore abandoned any argument that his inability to compel the agents to appear at trial resulted in the loss of material and favorable testimony. Instead, he contends that he need not make such a showing because, after Bruen, Valenzuela-Bernal is no longer "good law." As we explained above, however, Bruen concerned only the Second Amendment, and we do not interpret it to alter the Supreme Court's Sixth Amendment jurisprudence given that the "Court does not normally overturn, or so dramatically limit, earlier authority sub silentio." Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000).

Crater also contends that Valenzuela-Bernal does not control because it is factually distinguishable. In Valenzuela-Bernal, the government deported two non-citizens before a criminal defendant charged with transporting them could interview them. 458 U.S. at 861. In reaching the conclusion that the deportation did not violate the defendant's compulsory process right, the Court explained that such prompt deportation of non-citizens both "satisf[ied] immigration policy" and was justified by several practical considerations unique to the immigration context, such as the "financial and physical burdens" that detaining non-citizens impose on the government. Id. at 864-65. Thus, Crater argues, the Court's decision in Valenzuela-Bernal does not apply here because "the government's dual role of enforcing both criminal law and immigration law" informed its reasoning.

Crater is correct that the immigration context crucially informed the Court's decision in Valenzuela-Bernal. The Court announced the "material and favorable" standard for deported witnesses but noted that it "express[ed] no opinion on the showing which a criminal defendant must make in order to obtain compulsory process for securing the attendance at his criminal trial of witnesses within the United States." Id. at 873 & n.9 (emphasis added). Nonetheless, our prior cases, by which we are bound, have not confined the "material and favorable" standard to the immigration context. See, e.g., Hoffman, 832 F.2d at 1303. We

- 16 -

have explained that "[t]he showing of materiality and favorableness that an accused must make in one setting may not be the same as in another," but we have never held that a defendant can entirely decline to make this showing and still succeed on their Sixth Amendment claim. United States v. Bailey, 834 F.2d 218, 223 (1st Cir. 1987).

As Crater acknowledged at oral argument, our rejection of his Bruen argument is fatal to his compulsory process claim. In declining to enforce the trial subpoenas, the district court relied not only upon Crater's non-compliance with the agencies' Touhy regulations but also on Crater's proffer. Because it was "not clear from the proffer that the [agents'] testimony would be relevant, material, and vital to the defense," the court held that declining to enforce the subpoenas would not violate Crater's compulsory process right. By abandoning any argument under the material and favorable standard, Crater fails to oppose this conclusion.

We end our analysis here. Crater bases his constitutional challenge to the Touhy regulations on inapplicable precedent. The district court separately declined to enforce the subpoenas because the agents' testimony was irrelevant, and Crater has not argued that this decision violated his right to compulsory process by depriving him of material and favorable testimony. Thus, without expressing any opinion on the constitutionality of

enforcing Touhy regulations against criminal defendants, we conclude that the district court's decision not to compel the agents' testimony did not violate Crater's right to compulsory process. Cf. United States v. Vázquez-Rosario, 45 F.4th 565, 571-73 (1st Cir. 2023) (declining to rule on the sufficiency of a defendant's Touhy request and instead affirming the district court's decision to quash trial subpoenas against federal officers on relevance grounds).

## B. The Daubert Issue

Crater also challenges the district court's decision to admit Clegg's expert testimony without holding a Daubert hearing, which is "an evidentiary hearing . . . used by district courts to resolve factual issues related to admissibility" of expert testimony. Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 5 n.11 (1st Cir. 2021). See generally Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Crater argues that a hearing was necessary to evaluate Clegg's qualifications, her investigatory methods, and whether the risk of unfair prejudice or confusing the jury substantially outweighed the probative value of her proposed testimony.

Our case law does not support Crater's argument. As we have previously explained, "Daubert establishes that before admitting expert testimony, the trial court must fulfill its 'gatekeeping role' by making an independent determination that the

expert's proffered . . . knowledge is both reliable and relevant." United States v. Phillipos, 849 F.3d 464, 470 (1st Cir. 2017) (quoting Daubert, 509 U.S. at 597). But "[t]here is no particular procedure that the trial court is required to follow in executing [this] gatekeeping function," Smith, 732 F.3d at 64 (quoting United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002)), and we have specifically rejected the argument that a district court must necessarily hold an evidentiary hearing, see Phillipos, 849 F.3d at 471.

Crater does not grapple with this precedent or explain why the district court's procedure was nonetheless insufficient, such that it "entirely abdicated its gatekeep[ing] role." Lestage v. Coloplast Corp., 982 F.3d 37, 49 (1st Cir. 2020). Nor could he, given that the record demonstrates that the district court took its gatekeeping role seriously. The court heard oral argument on Crater's motion outside of the presence of the jury, during which it noted that it had reviewed Crater's motion, the government's opposition, Clegg's report, and the defense's expert summary. These documents cataloged Clegg's extensive professional experience in blockchain investigations: In addition to her work as the Director of Financial Investigations and Education for CipherTrace, she had created multiple training courses, conducted trainings for Interpol, Europol, and the United States Departments of Treasury, Homeland Security, and Justice, authored articles,

and lectured at conferences and universities on blockchain technology and cryptocurrency investigations. Thus, the court was unpersuaded by Crater's argument that Clegg's educational background alone rendered her unfit to opine as an expert. Given that Federal Rule of Evidence 702 -- which governs the admissibility of expert testimony -- allows an expert witness to be qualified by "knowledge, skill, experience, training, or education," we conclude that the district court did not abandon its gatekeeping function by declining to hold a Daubert hearing to further explore Clegg's qualifications. Fed. R. Evid. 702 (emphasis added).

Crater also suggests that Clegg's report "did not demonstrate that her conclusions were based on sufficient facts or data, or that her proposed testimony was the product of reliable principles and methods." But he has not identified which of Clegg's facts, data, methods, or principles he objects to, and given that Crater's own expert agreed that CipherTrace's blockchain analysis could "reveal a number of details of [a] system and its contents," we reject the argument that the district court should have held an evidentiary hearing because of Crater's vague methodological objections.

Finally, we disagree with Crater that the district court abdicated its gatekeeping function by resolving his relevancy and Federal Rule of Evidence 403 objections to Clegg's testimony

without holding a <u>Daubert</u> hearing. In fact, Crater does not explain what more a <u>Daubert</u> hearing could have accomplished with regard to these inquiries. He argued to the district court that allowing Clegg to opine that MBC was associated with a public blockchain after 2017 would lead to the "unduly prejudicial" inference that it was not associated with any blockchain, and therefore was not a cryptocurrency, prior to 2017. The record shows that the district court carefully considered this claim. At oral argument, it both asked for clarification and offered him the opportunity to respond to the government's opposing points. At the end of this colloquy, the court explained that Crater did not provide a compelling reason to exclude the testimony based on relevance or unfair prejudice but offered to return to the issue if Crater had more to add. Under these circumstances, we conclude that the district court faithfully executed its gatekeeping function under <u>Daubert</u>.[3]

---

[3] To the extent Crater challenges the district court's decision to actually admit the testimony under Federal Rules of Evidence 401 and 403, we see no abuse of discretion in the district court's ruling. See <u>Smith</u>, 732 F.3d at 64 ("If we are satisfied that the court did not altogether abdicate its role under <u>Daubert</u>, we review for abuse of discretion its decision to admit or exclude expert testimony."). Clegg's testimony was undoubtedly relevant, given that Crater had advertised MBC as a cryptocurrency with functionality analogous to Bitcoin. Moreover, Crater does not explain why the inferences a juror might draw from Clegg's testimony were "unfairly" prejudicial. <u>United States</u> v. <u>Ross</u>, 837 F.3d 85, 90 (1st Cir. 2016) ("In balancing the scales of Rule 403, it is important to note that only 'unfair' prejudice is to be

## III. CONCLUSION

For all these reasons, we **<u>affirm</u>** the judgment.

---

avoided, as 'by design, all evidence is meant to be prejudicial.'"
(citation omitted)).