# United States Court of Appeals
## For the First Circuit

No. 17-1169

MICHELLE DIMANCHE,

Plaintiff, Appellee,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendant, Appellant,

WILLIAM MCCLELLAN; STEPHANIE BRADE; SHERYL REGISTER;
MAXINE BELL; FRED OLSON; CHERYL ANDERSON,

Defendants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

———————————

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

———————————

Kevin P. Martin, with whom John C. Englander, Joshua Bone, Brian T. Burgess, and Goodwin Procter LLP, were on brief, for appellant.
Christopher J. Trombetta, with whom Law Office of Christopher J. Trombetta was on brief, for appellee.

———————————

June 18, 2018

———————————

**LYNCH, Circuit Judge**. The Massachusetts Bay Transportation Authority ("MBTA") appeals from the entry of a jury verdict awarding over $2.6 million in damages to a black female former employee who brought suit under 42 U.S.C. § 1981 and Mass. Gen. Laws ch. 151B, § 4. She alleges, inter alia, that her supervisors at the MBTA conspired to terminate her employment because of her race. The jury awarded her over $1.3 million in compensatory damages on her discrimination claim and $1.3 million in punitive damages.

The MBTA makes three levels of argument on appeal. First, the MBTA says that the evidence produced at trial was insufficient to support either the compensatory or the punitive damages awards comprising the over $2.6 million verdict. Second, the MBTA argues that the trial judge committed two types of reversible error in (a) imposing a draconian sanction as the price for removing the entry of default, and (b) allowing a hostile work environment theory not explicitly pled in the complaint to go to the jury. Third, the MBTA contends that it should be able to take advantage of Buntin v. City of Boston, 857 F.3d 69 (1st Cir. 2017), decided while this case was on appeal, to vacate the judgment and to dismiss this action.

Like the proverb that a battle can be lost for want of a nail,[1] the MBTA loses its appeal largely for want of its making appropriate objections and offers of proof before the trial court. The evidence was more than sufficient to support the compensatory damages award for wrongful termination and to justify the punitive damages amount. We do agree that the trial judge committed clear error in imposing the default sanction order. But, reviewing for plain error, we do not agree that the MBTA has shown that it was prejudiced either by the default sanction order or by the hostile work environment charge. We also find the MBTA's belated <u>Buntin</u> argument waived. Accordingly, we <u>affirm</u> the entry of judgment.

**I.**

**<u>Background</u>**

The plaintiff, Michelle Dimanche, is a black woman of Haitian descent, who worked as a motor person on the MBTA Green

---

[1] The provenance of this proverb is the following rhyme:

For the want of a nail the shoe was lost,
For the want of a shoe the horse was lost,
For the want of a horse the rider was lost,
For the want of a rider the battle was lost,
For the want of a battle the kingdom was lost,
And all for the want of a horseshoe nail.

<u>Oxford Dictionary of Nursery Rhymes</u> 324 (Ioana & Peter Opie eds., 1951). The first three lines were published by Benjamin Franklin in the 1757 edition of <u>Poor Richard's Almanac</u>. He prefaced the rhyme by saying, "A little neglect may breed great mischief." Benjamin Franklin, <u>Poor Richard's Almanac</u> 3, 17 (H.M. Caldwell Co. 1900) (1757).

- 3 -

Line from 2000 until 2013. In 2015, she filed suit in federal district court, alleging, among other things, wrongful termination on the basis of her race. We trace the events leading up to this appeal.[2]

Dimanche had an unhappy tenure at the MBTA. She testified that, throughout her employment, she was repeatedly harassed by her colleagues -- often her supervisors -- because of her race. Following a disagreement with a co-worker on January 25, 2013, Dimanche was suspended and then her employment was terminated on March 20, 2013.

A.   Dimanche's Suspension and Termination

The event triggering Dimanche's discharge occurred on the evening of January 25, 2013, at the MBTA Riverside Station office. During her night shift, Dimanche got into an argument with a co-worker, Gilberthe Pierre-Millien, who is also a black, Haitian woman. Both women allege that the other was the aggressor who yelled, cursed, spat, and continued the altercation from the office into the lobby area.

---

[2] Because the MBTA raises a sufficiency of the evidence challenge, we recount the events "in the light most favorable" to Dimanche as to that claim -- drawing all factual inferences and resolving all credibility determinations in her favor. See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 299 (1st Cir. 1998) (quoting Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 436 (1st Cir. 1997)).

Several MBTA employees witnessed the event. It is undisputed that Pierre-Millien reported the incident to a supervisor and also called the transit police. It is also undisputed that both women were suspended during the pendency of the investigation into the altercation.

The nighttime supervisor, Rico Gomes, initiated an investigation that same evening, and alerted the Director of Light Rail Operations, William McClellan, of the incident. The next day, the Deputy Director of Light Rail Operations, Edward Timmons, took over the investigation. At the time of the altercation, Dimanche had already received four disciplinary warnings[3] and a five-day suspension imposed by Tamieka Thibodeaux, the Division Chief of Light Rail Operations. Under the MBTA's policies, a fifth infraction could lead to termination. Based on Dimanche's disciplinary history and Gomes's report, Timmons recommended discharging Dimanche. McClellan concurred in the decision before passing it up the disciplinary chain of command. Ultimately, the

---

[3] These included warnings for: (1) engaging in an overtime dispute with a desk inspector, (2) engaging in a verbal confrontation with a train inspector who reprimanded Dimanche for bringing a cup of coffee onto the train, (3) failing to accommodate train passengers, and (4) refusing to divert a streetcar as requested by the Chief Inspector. As to the second infraction, Dimanche said that MBTA staff commonly brought beverages onto the train and were not disciplined for doing so. She also denied fault as to the other incidents.

MBTA's then-General Manager, Beverly Scott, decided to suspend Dimanche for thirty days and then to terminate her employment.

Dimanche alleges and maintains on appeal that all five disciplinary events leading up to her dismissal were fabricated or blown out of proportion as part of the MBTA's concerted effort to discharge her because of her race.

B.  MBTA Default

On January 8, 2015, Dimanche filed suit in federal district court, alleging three counts: (1) racial discrimination under 42 U.S.C. § 1981; (2) racial discrimination under Mass. Gen. Laws ch. 151B, § 4; and (3) intentional infliction of emotional distress.  The complaint alleged that the MBTA "subjected Ms. Dimanche to racial discrimination as a means to humiliate and ultimately terminate her," and pointed to six co-workers and supervisors as the perpetrators of the alleged racial harassment.[4]

The MBTA was properly served on February 20, 2015, but failed to file a timely answer due to a clerical error.  The district court entered default for Dimanche on June 2, 2015.  The MBTA filed a motion to set aside the default one week later, arguing that the default was inadvert, and that the MBTA had a

_____

[4]    The complaint listed these individuals -- William McClellan, Stephanie Brade, Sheryl Register, Maxine Bell, Fred Olson, and Cheryl Anderson -- as co-defendants with the MBTA. However, the trial only concerned the MBTA's liability.

- 6 -

meritorious defense.  The district court denied the motion without prejudice.  The entirety of that order read:

> Motion denied without prejudice to it being refiled within 30 days from the date of this order supported by detailed evidentiary affidavits setting forth the so-called "meritorious" defense.  The MBTA will be limited to the information set forth therein at trial.

The MBTA did not object to the order.  Instead, on July 31, it refiled the motion to set aside default, attaching thirteen affidavits and two exhibits.[5]  Six weeks later, the district court lifted the default (over Dimanche's objection) and reiterated the condition for its vacatur.  The entirety of this order read:

> Motion allowed.  The MBTA must understand, however, that its entire affirmative case is set forth in the data submitted in support of this motion.

(emphasis in original).

The MBTA again did not object.  On February 10, 2016 -- nearly five months after the district court had issued its order imposing the sanction -- Dimanche moved to clarify the scope of the sanction.  Specifically, she asked the district court whether "documents" that were "referenced in the MBTA's affidavits," but were not attached to the affidavits, should be deemed inadmissible

---

[5]      These included, inter alia, affidavits from individuals who were involved in disciplining Dimanche and from witnesses to the altercation.  The MBTA also attached interview and discipline slips that demonstrated Dimanche had already been placed on "final warning" when her altercation with Pierre-Millien took place.

at trial.  The MBTA opposed this motion, arguing that it should only be limited to the "information set forth in the affidavits at trial," not to the affidavits and attachments themselves.  The district court denied Dimanche's motion for clarification in a February 26, 2016 order, stating, "No clarification is necessary." It also emphasized: "This order is not a ruling that documents not disclosed in response to the Court's earlier order are some how [sic] admissible . . . ."

For the third time, the MBTA did not object.  Instead, the MBTA filed its own motion for clarification of the February 26, 2016 order.  The MBTA suggested that the order had a "typographical error" and asked the district court to revise the order to read, "This is not a ruling that the documents not disclosed in response to the Court's earlier order are somehow inadmissible." (emphasis added).  The district court denied the motion.  The MBTA did not object, or make any offer of proof, or seek reconsideration.  It chose to proceed to trial.

C.   Trial Proceedings and Evidence

The trial lasted four days, beginning on October 17, 2016.[6]  Dimanche took the stand and also presented three other

---

[6]   Before trial, the MBTA filed a motion in limine to exclude evidence of the harassment Dimanche endured before June 2011 because those allegations formed the basis for (1) a workers' compensation claim she had filed before the Department of Industrial Accidents and (2) a prior action she had filed in state

witnesses: two former co-workers, Virginia Davis and Perry Spencer, and her treating psychiatrist, Dr. Stephen Dubin. The MBTA[7] presented nine witnesses, including three eyewitnesses to the altercation: Gilberthe Pierre-Millien (who Dimanche had said instigated the altercation on January 25, 2013), and James Civil and John Foster (who witnessed it); and three MBTA staff involved in disciplining and terminating Dimanche: Tamieka Thibodeaux, William McClellan, and Edward Timmons.

---

court (which was dismissed with prejudice). At trial, the district court judge agreed to exclude the workers' compensation decision awarding Dimanche temporary incapacity benefits for her emotional distress, stating, "We're not going to introduce the findings of the hearing officer." However, the judge never ruled on whether Dimanche could offer evidence as to the underlying instances of harassment. Throughout the trial, the judge allowed Dimanche to testify as to the racial harassment she experienced pre-June 2011, and the MBTA did not object.

On appeal, the MBTA argues that all of the pre-June 2011 evidence should have been excluded because it is barred by claim preclusion and by Rule 403 of the Federal Rules of Evidence. We decline to reach either issue because the MBTA failed to object at the time of trial. Pretrial motions in limine in situations like this need to be renewed and pressed at trial in order to be preserved. See Fed. R. Evid. 103 advisory committee's note to 2000 amendment (emphasizing "the obligation on counsel to clarify whether an in limine or other evidentiary ruling is definitive when there is doubt on that point"); Crowe v. Bolduc, 334 F.3d 124, 133 (1st Cir. 2003) ("Our rule as to motions in limine is that a party must renew at trial its motion to . . . exclude evidence if there has been an earlier provisional ruling by motion in limine and a clear invitation to offer evidence at trial.").

[7] The MBTA was represented by its own in-house counsel at trial; it has different counsel on appeal.

Dimanche and her witnesses testified that throughout Dimanche's employment with the MBTA, she was subjected to unrelenting racial harassment by MBTA staff.  For instance:

- Dimanche said that John Foster, a white inspector, refused to let her use the restroom during her shift, commenting that Dimanche's "black ass always want to go to the bathroom every two second [sic]."  She said Foster called her a "black bitch," and told her he was "going to pill [her]," which she interpreted as a threat.

- Dimanche also testified that Joe Napoli, a white inspector, repeatedly called her "black bitch" to her face and referred to her as "cuckoo" over the Green Line radio.  Those radio statements were heard by many people.  Napoli also blocked Dimanche from entering a work building, and threatened, "I'll talk to my colleagues and see what they're going to do." Dimanche testified that she felt so unsafe that she ended up filing a police report against Napoli based on this and on five other instances of harassment by him.

- Virginia Davis, Dimanche's former co-worker, testified that Green Line officials often mimicked Dimanche's Haitian accent and "ma[d]e noise[s] like animals at her" over the radio. Davis also testified that she heard "a lot of inspectors" say things about Dimanche like, "I'm going to get that . . . B-I-T-C-H."

- Perry Spencer, another former co-worker, corroborated Dimanche's testimony. He stated that Napoli mocked Dimanche's accent, "telling her that she needed to go back to her country."

Dimanche testified that she reported these instances to management, but the harassment continued. According to Dr. Dubin, Dimanche developed post-traumatic stress disorder as a result of the hostile work environment and was forced to take a leave of absence.[8] When she returned to work in late 2010, the racial harassment persisted. Specifically:

- Dimanche testified that Napoli and Foster continued their behavior. Foster even wrote Dimanche up for an absence that he had previously excused. Dimanche also testified that another Green Line supervisor, Fred Olson, refused to process her complaints. Olson told her that McClellan instructed him not to speak to Dimanche without a witness present and explained, "[e]verybody know[s] [Dimanche was] on the way out."

---

[8] Pre-trial filings contained the following information. In April 2010, Dimanche filed a workers' compensation claim for the emotional distress she suffered as a result of Napoli's harassment. The administrative law judge awarded Dimanche temporary incapacity benefits. She appealed for double damages. While the appeal was pending, the MBTA settled the case. Dimanche also filed a racial discrimination suit in state court based on the same allegations. That suit was dismissed with prejudice in June 2011 after Dimanche's counsel filed a motion to withdraw the matter.

- Davis and Spencer corroborated Dimanche's testimony that the MBTA's management was targeting her for termination. Davis testified that she overheard McClellan tell another MBTA official, "I'll get her black ass," when referring to Dimanche. Another inspector, Steve Nardona, also told Davis to stay away from Dimanche because "she's trouble, they don't like her and they're going to fire her." Spencer stated that he was told the same in 2011 or 2012.

As to the altercation on January 25, 2013, Dimanche testified that Pierre-Millien was the aggressor, and complained that MBTA officials told Pierre-Millien to lie about the event. Further, Dimanche testified that each of her previous four infractions had been fabricated and was part of the management's concerted effort to terminate her employment.

In turn, the MBTA offered testimony regarding its disciplinary policy, the details of the altercation, its investigation, and its decision to terminate Dimanche. McClellan and Foster, whom Dimanche accused of discrimination, both testified. At no point, however, did the MBTA ask its witnesses to address Dimanche's specific allegations of racial harassment. Nor did it make any offer of proof as to what they would have testified, if asked.

During the charge conference, the trial judge raised, for the first time, the notion that he would instruct the jury on

a hostile work environment theory. The MBTA objected on the grounds that a hostile work environment could not serve as a stand-alone basis for the MBTA's liability. The trial judge initially agreed. However, he apparently changed his mind because he instructed the jury that they could find the MBTA liable on either wrongful termination or hostile work environment grounds; the only difference was the amount of damages to which Dimanche was entitled.

The jury returned a general verdict for Dimanche on October 20, 2016, assessing the MBTA $1,325,462.91 in compensatory damages and $1,300,000.00 in punitive damages. The MBTA renewed its prior objection to the charge as to hostile work environment being a stand-alone basis for liability. It did not, at either the charge conference or in its post-trial objection, make the argument, which it makes on appeal, that the theory caught it by surprise or came too late. Represented by new counsel, the MBTA also filed various post-trial motions, all of which were denied.

\* \* \*

The MBTA now appeals from the district court's denial of its motion for judgment as a matter of law, motion for a new trial, and motion to vacate or reduce the punitive damages award. It raises three bases for reversal/dismissal: there was insufficient evidence to support the jury verdict; the district judge committed reversible error; and the court lacked subject matter

- 13 -

jurisdiction.  We reject all three bases and affirm the entry of judgment.

## II.

### The MBTA's Sufficiency of the Evidence Challenge

The MBTA first argues that we must vacate the judgment because there is insufficient evidence to support the jury's compensatory and punitive damages awards.  The MBTA seeks judgment as a matter of law, or, in the alternative, a new trial.

We assume the federal standard applies to the MBTA's sufficiency challenge, absent any suggestion from the parties that it makes any difference in this case.  Accordingly, "our review is weighted toward preservation of the jury verdict."  Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002).  "[W]e must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them."  Id. at 41-42 (alteration in original) (internal quotation marks omitted) (quoting Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001)).  "[V]iew[ing] the evidence 'in the light most favorable to [Dimanche, and] drawing all reasonable inferences in [her] favor,'" McMillan, 140 F.3d at 299 (quoting Morrison, 108 F.3d at 436), we conclude the verdict must stand.[9]

---

[9] We acknowledge the difference between the standards governing a motion for judgment as a matter of law and a motion for a new trial.  See Jennings v. Jones, 587 F.3d 430, 438-39 (1st

- 14 -

A.    Liability for Wrongful Termination

        Although the trial judge charged the jury with two theories of discrimination, and the jury rendered a general verdict as to compensatory damages, the award amount -- $1,325,462.91 -- exactly matches the stipulated damages for Dimanche's wrongful termination claim.  The judge also made clear to the jurors that if they based their verdict only on a finding of a hostile work environment, Dimanche would not be entitled to receive front pay, back pay, or retirement pay, but rather would be limited to emotional harm.  We thus consider whether there was sufficient evidence for the jury to reasonably conclude that the MBTA terminated Dimanche because of her race.  See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29-30 (1st Cir. 2004) (noting an exception to the general rule that "a new trial is usually warranted if evidence is insufficient with respect to any one of multiple claims covered by a general verdict" when the court "could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support" (internal quotation marks omitted)).  The parties agree that the standard is the same for Dimanche's wrongful termination claim under both 42 U.S.C. § 1981 and Mass.

Cir. 2009).  We nevertheless apply the standard set forth above because, in reviewing the denial of a motion for a new trial, to the extent it is predicated on a challenge to the sufficiency of the evidence, the inquiries merge.

Gen. Laws ch. 151B, § 4. See Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008).

Here, assuming the jury credited Dimanche's testimony and the testimony of her witnesses, there is ample, direct evidence of racial discrimination. Three of the MBTA's supervisory staff who either concurred in Dimanche's dismissal or were involved in the investigation of the January 25th altercation, had demonstrated racial animus towards her. McClellan was reported to have said that he wanted to "get her black ass." And Foster and Napoli had a long history of mocking Dimanche's Haitian accent, calling her "black bitch," threatening her, and attempting to retaliate against her for making complaints. Coupled with Dimanche's testimony that each of her four previous disciplinary infractions was fabricated, a reasonable jury could have concluded that the MBTA improperly terminated her employment because of her race. See Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 83 (1st Cir. 2004) (holding that under certain circumstances, "corporate liability can attach if neutral decisionmakers, when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus").

We are reasonably sure, for the reasons stated earlier, that the jury did not rely on the hostile work environment assertion to enter the compensatory damages award. However, to

- 16 -

cover all bases, we conclude that the evidence was more than adequate to support damages on the hostile work environment theory as well. We agree with and quote the trial judge: "there's extensive evidence here, if [the jurors] believe it, of a hostile work environment . . . ."

B.   Punitive Damages Award

The MBTA also did not object to the use of a general verdict as to punitive damages, with no specifications as to whether the damages were awarded under § 1981 or under Mass. Gen. Laws ch. 151B, § 4. We assume the state law standard for punitive damages governs here, absent any indication by the parties that applying the federal standard would make any difference. "We consider first whether the [MBTA] was on notice of the harassment and failed to take steps to investigate and remedy the situation; and, second, whether that failure was outrageous or egregious." Gyulakian v. Lexus of Watertown, Inc., 56 N.E.3d 785, 794 (Mass. 2016). The Supreme Judicial Court of Massachusetts has fashioned a list of factors to determine "whether the defendant's conduct was so outrageous or egregious that punitive damages . . . are warranted." Haddad v. Wal-Mart Stores, Inc., 914 N.E.2d 59, 75 (Mass. 2009). These include:

> (1) whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class);

- 17 -

(2) whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

(3) the actual harm to the plaintiff;

(4) the defendant's conduct after learning that the initial conduct would likely cause harm; [and]

(5) the duration of the wrongful conduct and any concealment of that conduct by defendant.

Id.

Those factors are amply met here. Dimanche's evidence, if believed, establishes numerous instances of notice to the MBTA of racially-based and racially-demeaning comments made to Dimanche, a failure to investigate her complaints to management, a failure to discipline the offenders or to remedy the situation, and a concerted effort to isolate her and to cause the termination of her employment.[10] Nor do we see any reason to remit the punitive damages award, especially because the ratio of punitive damages to compensatory damages was less than 1:1.

---

[10] The MBTA also makes a convoluted argument that the evidence is insufficient to support the jury verdict because much of Dr. Dubin's testimony should have been excluded. Specifically, the MBTA takes issue with Dr. Dubin's statements as to "alleged incidents of harassment that Plaintiff herself never identified," and his "vouch[ing] for Plaintiff's credibility." We decline to rule on the admissibility of Dr. Dubin's testimony as the argument was not squarely raised in the MBTA's appellate briefing. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## III.

### The District Court's Alleged Trial Errors

The MBTA next urges this court to vacate the jury verdict because it says that the trial judge committed two fundamental errors by (1) imposing a draconian punitive sanction for the MBTA's inadvertent default, and (2) adding a hostile work environment charge on the last day of trial.

Ordinarily our review is for abuse of discretion, but not when the issues are unpreserved. See Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002). Here, the parties twice sought clarification of, and the MBTA did not object to, the district court's conditions for lifting the default. The MBTA also failed to object at trial that the belated addition of the hostile work environment charge was unfairly prejudicial. Accordingly, we review both only for plain error. Id.

The plain error standard has four prongs: "(1) an error was committed; (2) the error was 'plain' (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent a miscarriage of justice." Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999). This circuit has long expressed "marked reluctance to find plain error in civil cases." Acevedo-Garcia v. Monroig, 351 F.3d 547, 570 (1st Cir. 2003). While the district court's default sanction order was in error, the MBTA cannot

demonstrate prejudice.  We also find that the MBTA failed to meet prongs three and four of the plain error test as to the addition of the hostile work environment claim.

A.   Default Sanction Order

This circuit has never addressed whether district courts can impose evidentiary sanctions on a defaulting party as a condition for removal of default.  However, we have long cautioned that entry of default judgment is a "drastic" measure that should only be employed in "extreme situation[s]."  Stewart v. Astrue, 552 F.3d 26, 28 (1st Cir. 2009) (quoting Affanato v. Merrill Bros., 547 F.2d 138, 140 (1st Cir. 1977)).  It may have been reasonable for the district court to make the MBTA file short affidavits, going to the point that it had a meritorious defense, before lifting its default.  See Indigo Am., Inc. v. Big Impressions, LLC, 597 F.3d 1, 4 (1st Cir. 2010).  We do not decide that here.  However, it was entirely unreasonable for the district court to restrict the MBTA's proof at trial to what was said in those affidavits.  Indeed, we have found no case approving of such a sanction.

We recognize that some of our sister circuits have held that "a reasonable condition" may be imposed "in order to avoid undue prejudice to the opposing party."  Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 515 (2d Cir. 2001) (citing 10A Wright & Miller, Federal Practice and Procedure, § 2699, at 169 (3d ed. 1998), and

case law across four circuits).  But in those cases, the plaintiff was actually prejudiced by the delay -- as found by the district court or the court of appeals -- and the proposed curative measure was that the defendant had to post a bond equal to all or part of the default judgment amount.  See, e.g., id. at 514-15; see also Krause v. Featherston, 376 F.2d 832, 834 (1st Cir. 1967) (finding that "[t]he condition imposed by the district court for setting aside the default [was] not unreasonable, under the circumstances" where the court ordered the defendant to post a $500 bond); 10A Wright & Miller, Federal Practice and Procedure, § 2700, at 170-71, 170 n.4 (4th ed. 2018) (collecting cases).  These financial penalties in no way limited the defendants' ability to fully litigate the case and to defend themselves at trial.

The trial court here failed to provide any factual or legal basis for imposing an evidentiary sanction on the MBTA.  Its order was only two sentences long, and the court twice declined to explain or justify the scope of the sanction.  In fact, the sanction on its face was calibrated not to ameliorate any prejudice to Dimanche, but instead to punish the MBTA.  Even Dimanche's own papers do not argue that excusing the MBTA's default would be unfair.  The trial judge also failed to cite any case law justifying the order.  This is unsurprising.  The only precedent on point expressly rejects the imposition of such a sanction.  See Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 53-54 (E.D.N.Y. 2008)

- 21 -

(rejecting non-defaulting party's proposal to impose an identical sanction).

Further, the punitive aspect of the order was plainly excessive under any measure. Dimanche's complaint did not inform the MBTA of who her witnesses would be at trial or the specific proof she would offer. The MBTA could not have been reasonably expected to guess. As such, the error here is "obvious and clear." Smith, 177 F.3d at 26.

Because plain error review requires more than just an error by the district judge, however, we decline to vacate the jury verdict. The MBTA has not shown that it was prejudiced by the imposition of the sanction. It failed to make any offers of proof at trial as to what it would have presented as evidence absent the sanction. The prejudice prong of the plain error standard requires "a stringent demonstration of causation," Acevedo-Garcia, 351 F.3d at 571; the MBTA must prove that it was "obvious" that the limitation "affect[ed] the final outcome" of the trial, id. (quoting Chestnut, 305 F.3d at 571). The causal link must be "manifest on the face of the record." Id.

The MBTA cannot make such a showing. The transcript reveals that the default sanction order played out in two ways at trial. Often, the trial judge did not enforce the sanction and allowed the MBTA's witnesses to testify beyond the scope of their affidavits. In the dozen or so times when the trial judge did

limit testimony, the MBTA failed to protest or provide an offer of proof as to the excluded testimony. Without such offers of proof, it is nearly impossible for this court to find that the sanction resulted in prejudice "manifest on the face of the record." Id.

The MBTA argues on appeal that, but for the sanction, it would have presented a targeted defense to Dimanche's allegations that McClellan and Foster -- two of the supervisors who were involved in her dismissal -- subjected her to racist comments. But the MBTA cannot point to an offer of proof as to what testimony its witnesses would have provided to undermine Dimanche's story. The MBTA could have easily sought to question McClellan and Foster (both called as witnesses at trial) about their alleged conduct, and asked the judge to modify the sanction order, but it chose not to. This omission is glaring, as the MBTA repeatedly went beyond the bounds of the sanction when soliciting witness testimony on other topics (without getting the court's prior consent).

And while the lack of an effective objection at trial and proffer is fatal, it is noteworthy that even on appeal, with the benefit of hindsight, the MBTA cannot point to any instances where it was prevented from introducing evidence that would have

affected the outcome of the trial.[11]  Accordingly, we find no reversible error.

B.   Hostile Work Environment Charge

The MBTA, ignoring in its appellate briefing the issue of the appropriate standard of review for this claim, also argues that it was unfairly prejudiced "when the District Court allowed [Dimanche] to add a hostile work environment theory on the last day of trial," and alleges that the theory was first raised at the charge conference.  But nowhere does the MBTA's appellate brief say that it objected at trial on the basis that the theory was raised at the last minute or argue that it did not waive any such objection.

Once again, then, our standard of review is for plain error.  We bypass the question of whether the trial judge erred in submitting this theory to the jury (and our own conclusion that it could not have been the basis for the compensatory damages award),

---

[11]    The MBTA did reference several instances of when the trial judge enforced the sanction.  However, none of the excluded testimony countered McClellan's or Foster's alleged harassment. The best example the MBTA can point to is that McClellan was prevented from answering whether he "consider[ed] the plaintiff's past history of making any complaints against [him] or against anyone else when [he] made the decision to concur [in her dismissal]."  But even if the MBTA had made an offer of proof of McClellan's answer, it is highly unlikely that this would have affected the outcome of the trial in light of the record as a whole.

and find that the MBTA has not satisfied either the third or fourth prongs of the plain error standard.

As to prejudice, the MBTA argues on appeal that if it had had notice of a "standalone" hostile work environment claim, it would have changed its trial strategy in three ways. First, the MBTA asserts it would have sought to exclude evidence of the alleged harassment from before June 2011. But the MBTA already had incentive (and failed) to do so. The same is true as to evidence the MBTA says it could have introduced regarding "the general nature of MBTA's workplace." Second, the MBTA says it would have "gathered evidence and presented witnesses to rebut [Dimanche's] allegations of harassment." But, as noted above, the MBTA never made an offer of proof as to what this evidence might be. Third, the MBTA contends it would have asked for a limiting jury instruction about "the irrelevance of the pre-June 2011 evidence to the hostile work environment theory." It is far from clear such evidence would have been irrelevant. And the MBTA knew that the district court would instruct the jury on a hostile work environment theory, but it did not ask at the charge conference, or at any point thereafter, for a limiting instruction. The MBTA has not shown prejudice.

Our earlier discussion also requires a finding of no miscarriage of justice.

## IV.

## The Buntin Issue

Finally, the MBTA asks us to relieve it of the jury verdict on the basis of our decision in Buntin, 857 F.3d 69. We decline to do so, finding that the MBTA has waived the issue.

This court decided Buntin on May 15, 2017, after the jury rendered its verdict on this matter, and after the MBTA filed its initial brief on appeal. Buntin resolved an issue of first impression in this circuit, but not in other circuits, and held that "a plaintiff may not bring claims for damages under 42 U.S.C. § 1981 against state actors, including defendants sued in their official capacities as government officials." Id. at 70. Dimanche briefed the effect of Buntin on appeal, as did the MBTA in its reply brief.

We outline the bases that lead us to reject the MBTA's argument.

(1) The only basis for federal jurisdiction asserted in Dimanche's complaint was under 42 U.S.C. § 1981;

(2) The question of whether a § 1981 cause of action could be brought against a state agency was an open question in this circuit long before and during the trial;

(3) When the complaint was filed on January 8, 2015 in this action, eight circuit courts had ruled that § 1981 did not extend to private rights of action against state actors;

(4) The argument was readily available to counsel for the MBTA, should it have wished to argue the MBTA was a state agency and that there was no jurisdiction;

(5) The MBTA, nonetheless, never moved in the district court to dismiss the § 1981 claim for failure to state a claim against it; it also did not argue for dismissal on the grounds that it is a state agency for the purposes of § 1981;

(6) Nor did the MBTA ever suggest to the district court that it lacked subject matter jurisdiction to hear the case; and

(7) Dimanche has also raised pendent state law discrimination claims in addition to her § 1981 claim, and the jury verdict in her favor was a general verdict.

The MBTA argues that Buntin requires us to vacate the jury verdict and to dismiss the case for lack of subject matter jurisdiction. Specifically, the MBTA says that Buntin held the reach of § 1981 was a question of subject matter jurisdiction, which it was free to raise at any time. We disagree. Buntin held that no cause of action existed under § 1981 against the City of Boston because it is a state actor. Id. There, we affirmed the district court's remand of the remaining state law claims to state court after the court dismissed the § 1981 claim -- the only federal claim -- in that case. Id. at 70, 76. Buntin is unhelpful to the MBTA because it merely holds that a district court can

- 27 -

dismiss the case even where pendent state claims are also asserted; it does not require dismissal.

The MBTA does not attempt to excuse its failure to even raise the issue of whether § 1981 extended to the MBTA until its reply brief on appeal. And in that reply brief, the MBTA, at most, refers to DSC Communications Corp. v. Next Level Communications, 107 F.3d 322 (5th Cir. 1997), in a footnote, in an attempt to persuade us. But that case is of no help to the MBTA. Unlike the court in DSC, we would not be perpetuating "incorrect law," id. at 326 n.2, by holding the MBTA to its waiver, given the state law basis for the jury's verdict. This is not an instance where defendants could not have raised the issue before appeal.

In our view, the argument that § 1981 does not provide a cause of action against state actors for damages was easily available to the MBTA, if indeed the MBTA is a state actor, from even before the date the complaint was filed through its initial brief on appeal, well before Buntin was decided. The MBTA must live, as to the jury verdict, with the consequences of its own mistakes. To hold otherwise would cause severe prejudice to plaintiff.

**V.**

**Conclusion**

We affirm the entry of judgment against the MBTA.