# United States Court of Appeals
## For the First Circuit

No. 19-2037

AMY LESTAGE,

Plaintiff, Appellee,

and

UNITED STATES AND THE STATE OF CALIFORNIA, ex rel., KIMBERLY
HERMAN, AMY LESTAGE AND KEVIN ROSEFF,

Plaintiffs,

v.

COLOPLAST CORP.,

Defendant, Appellant,

and

COLOPLAST A/S; CONVATEC, INC.; HOLLISTER, INC.; 180 MEDICAL,
INC.; A-MED HEALTH CARE, INC.; BYRAM MEDICAL SUPPLIES, INC.; CCS
MEDICAL SUPPLIES, INC.; LIBERTY MEDICAL SUPPLIES, INC.;
LIBERATOR MEDICAL SUPPLY, INC.; SHIELD MEDICAL, INC.; UROMED,
INC.; RGH ENTERPRISES, INC.; SHIELD CALIFORNIA HEALTHCARE
CENTER, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Elisabeth S. Theodore, with whom Samuel F. Callahan and Arnold & Porter Kaye Scholer LLP were on brief, for appellant.

Rachel M. Wertheimer, with whom Paul W. Shaw, Tawny L. Alvarez, and Verrill Dana, LLP were on brief, for appellee.

December 9, 2020

**LYNCH**, **Circuit Judge**. This case under the anti-retaliation provision of the False Claims Act raises an issue of first impression in this circuit as to the proper causation standard. 31 U.S.C. § 3730(h)(1). Amy Lestage filed suit against her employer Coloplast Corporation ("Coloplast") in 2016 alleging that Coloplast had retaliated against her in violation of the False Claims Act after it learned that she had filed a qui tam action against it and one of its largest customers. Lestage was placed on indefinite administrative leave four days after that customer requested that Lestage stop serving its account. When she returned from leave after the qui tam suit against Coloplast was settled, Lestage says she was given an inferior slate of account assignments.

After a five-day trial, the jury concluded that both the leave and the account assignment were adverse employment actions taken because of Lestage's involvement in the qui tam suit and awarded Lestage $762,525 in compensatory damages.

The district court denied Coloplast's subsequent motions for judgment as a matter of law and a new trial. Fed. R. Civ. P. 50, 59. Coloplast appeals from the denials of these motions, challenging the sufficiency of the evidence to support the verdict, whether plaintiff's expert testimony as to damages was properly admitted, and whether the jury instructions, to which it had consented, were error.

We reject Coloplast's claims of error and affirm. In doing so, we hold under Supreme Court precedent that the causation standard for retaliation claims under the False Claims Act is a "but-for" standard. We join the Third, Fourth, Fifth, and Eleventh Circuits in doing so. See DiFiore v. CSL Behring, LLC, 879 F.3d 71, 73 (3d Cir. 2018); U.S. ex rel. Cody v. ManTech Int'l, Corp., 746 Fed. App'x 166, 176-77 (4th Cir. 2018) (unpublished opinion); U.S. ex rel. King v. Solvay Pharms., Inc., 871 F.3d 318, 333 (5th Cir. 2017); Nesbitt v. Candler Cnty., 945 F.3d 1355, 1359 (11th Cir. 2020).

## I. Factual Background

In reviewing the denial of Coloplast's motion for judgment as a matter of law, we examine all evidence in the light most favorable to the jury verdict. See ITYX Sols. AG v. Kodak Alaris, Inc., 952 F.3d 1, 9 (1st Cir. 2020).

Coloplast is a medical device company that develops ostomy, continence, wound, and skin care products. Coloplast has between 12,000 and 16,000 sales accounts. Just forty to fifty of these, called key accounts, provide over 95% of Coloplast's sales. Key accounts vary in size, but most have at least $1 million in sales per year or substantial growth potential.

Key account managers ("KAMs") are responsible for making sales to and managing Coloplast's relationship with key accounts. KAMs receive a base salary and a bonus, but the bonus makes up a

large percentage of their compensation. The bonus is based on the growth in sales in the accounts they manage. If a KAM achieves his or her "target" growth in sales, the KAM receives 100% of a set commission ($80,000 in the relevant time period). If growth exceeds the target, the KAM is paid more, and if growth falls short of the target, the KAM is paid less. Management sets the individualized growth targets each year.

Lestage began working as a salesperson for Coloplast in 2004. In 2010, she became Coloplast's first key account manager.[1] In 2013 and 2014, she was the highest-performing KAM at Coloplast. Among her key accounts was Byram Health Care ("Byram"), which is one of Coloplast's largest accounts. Byram made up approximately 80% of her sales portfolio by volume.

In December 2011, Lestage and others filed a qui tam action under the False Claims Act against Coloplast and several Coloplast competitors and clients, including Byram. The qui tam complaint alleged that Coloplast had paid kickbacks to clients, including Byram. The complaint was filed under seal as required by law. See 31 U.S.C. § 3730(b)(2). This meant that neither Coloplast nor Byram was notified of the suit during this period of sealing. The US Department of Justice ("DOJ") investigated the allegations and ultimately decided to pursue them. The complaint

---

[1] When Lestage was promoted in 2010, her job title was "distribution account manager," Coloplast's old term for KAMs.

- 5 -

was unsealed on August 21, 2014. Near the end of November 2014, Lestage noticed that Byram had stopped replying to her emails and phone calls.

On December 19, 2014, Byram's CEO sent an email to Edmond Veome, then Coloplast's Senior Vice President of the North America region, with an attached letter stating that Byram "no longer wish[ed] to work with Amy Lestage regarding our business together" and would like to be assigned to a new KAM.

Veome asked Byram why it wished to remove Lestage from its account. The Byram representative told Veome to contact Byram's attorneys with any questions. Veome reached out to Coloplast's in-house counsel as well as Thomas Beimers, the lawyer representing Coloplast with respect to the DOJ qui tam suit. Veome, Beimers, Nick Pederson (Coloplast's human resources director), and Mort Hansen (Lestage's direct supervisor) met several times in the following days. The content of those conversations was not disclosed under claims of attorney-client privilege.

On December 23, 2014, Hansen and Pederson called Lestage and told her she was being placed on indefinite paid administrative leave. Pederson sent a follow-up letter later that day which stated that "as a result of Byram's demand, we are placing you on an indefinite, paid administrative leave effective as of December 23, 2014, while we investigate this matter further." Coloplast

did not ask her to continue managing her other key accounts with four other customers. Coloplast presented no evidence that anyone at Coloplast performed any investigation during the period Lestage was placed on leave.

During the administrative leave, Coloplast continued to pay Lestage her base salary, as well as 100% of her target incentive bonus. Coloplast also gave her the standard annual 2.5% raise and allowed her to keep her company car and gas card. Coloplast cut her off from use of her Coloplast email account while she was on leave. Coloplast presented no evidence that it had promptly notified her other key accounts that she had been placed on leave.

Lestage was not asked to return until January 2016, after Coloplast had agreed to settle the qui tam action. Veome testified at trial that the decision to bring Lestage back to work was somewhat independent of the resolution of the qui tam action, but at his deposition he had stated that when the qui tam action was "moving toward resolution" was "the time to bring her back to work because there was no longer going to be the pending investigation. There was an outcome that was being delivered, and so it would be okay for her to return."

In December 2014, when she was placed on leave, Lestage was managing five key accounts: ABC Home Medical ("ABC"), Byram, Home Care Delivered, Claflin, and Buffalo Hospital Supply

("Buffalo"). Upon her return, she was given the Claflin, Home Care Delivered, and Buffalo accounts along with four new accounts: Geriatric, AmerisourceBergen, Blackburn's, and Concordance. Lestage had asked not to be reassigned to the Byram account but told Coloplast she wanted the ABC account. She was not assigned the ABC account at any time after her return, even when the person who handled the account during her leave left that job.

While Lestage was on leave, the ABC account was managed by Henrik Wurgler, a non-KAM employee. At the time of Lestage's return, ABC was in the process of selling its business. Hansen gave as a reason why Lestage did not receive the ABC account that in July 2015, when ABC was told that Lestage would be returning from leave, ABC requested that Wurgler remain on the account because he had been "an outstanding supporter of ABC Medical and [was] always timely in his response, unlike his predecessor."[2]

---

[2] The parties dispute who ABC was referring to when it said "his predecessor." Lestage's direct supervisor, Mort Hansen, was managing the account right before Wurgler took over. But ABC's request was directed to Hansen, and the email was a discussion about whether Lestage should be returned to the account, suggesting that the email referred to Lestage.

Lestage learned only upon returning to work that Coloplast had not initially told ABC about her leave. During her leave she received several emails from ABC to her work address, but she never saw them because she was cut off from her work email while on leave. Four months after her leave began, an ABC employee sent another email to her work address asking why she was not responding to ABC's emails. She saw this email about a year later when she returned to work.

- 8 -

Hansen also testified that Coloplast "had internal knowledge at the time [of the merger] at the management level that there's a high likelihood that [the account ABC merged with] was somehow financially tied to . . . one of the qui tam action accounts."[3]

Wurgler left in early 2016 and Timothy Townson was assigned the ABC account, not Lestage. Hansen testified that Townson was assigned the account because he was located in California, where the ABC point-of-contact would be located after the merger. The only explanation for why her location in New England was a barrier to her handling this account was testimony that Coloplast was trying to reduce costs and ease of travel for KAMs. The account was transferred again to Yvonne Battistini, not to Lestage, in late 2018 or early 2019.

Lestage also asked to be assigned to the Cardinal account when its existing KAM was promoted to director of key accounts in 2019. Cardinal is located in the Northeast, near Lestage's other accounts. She was denied the Cardinal account.

The parties dispute whether the four new accounts assigned to Lestage were high-performing accounts which would allow Lestage to meet her growth targets.

---

[3] Hansen testified to several additional reasons that Lestage was not returned to the ABC account. ABC was in negotiations to merge with another business, so Hansen did not think it was a good time to change account managers. There were several ongoing marketing campaigns Hansen did not want to disrupt.

Lestage testified that Blackburn's had "some" but not "substantial" growth potential, that it was not willing to engage in marketing campaigns with Coloplast and did not have an "outside sales force" which would allow Lestage to drive business to the account. It grew at -2.8% in 2017 and 8.4% in 2018.

AmerisourceBergen is a larger account with an outside sales force, but Lestage testified that due to AmerisourceBergen's lines of business, which do not overlap substantially with Coloplast's business, it was difficult for her to drive sales with that firm. AmerisourceBergen grew at -17.4% in 2017 and 2.5% in 2018.

Geriatric was not a key account when it was assigned to Lestage. Geriatric is also a long-term care distributor, and Coloplast does not focus on long-term care. Geriatric's sales grew 23.9% in 2017.

Concordance was a successful account which grew at 3.8% in 2017 and 18.1% in 2018.

ABC grew at 76.4% in 2017 and 28.9% in 2018.

Coloplast maintained at trial that the accounts Lestage was assigned were a reasonable mix of accounts with opportunity to grow.

## II. District Court Proceedings

In May 2016, Lestage amended her qui tam complaint to allege that Coloplast had retaliated against her in violation of the False Claims Act.

A jury trial was held from April 8 through April 12, 2019. On April 9, the parties read twenty-seven joint factual stipulations to the jury, including one that stated that "Coloplast placed Ms. Lestage on a leave in response to Byram's request to have her removed from its account."

Before trial, Coloplast filed a Daubert motion to exclude the testimony of plaintiff's damages expert, economist Dr. Judith Roberts. The court reserved decision on the motion. Before permitting Dr. Roberts to take the stand, the district court asked Lestage's counsel several questions about Dr. Roberts' methodology. The court instructed the jury that Dr. Roberts "ha[d] to be qualified" and that "[the district court] ha[d] to make a judgment as to whether she's qualified." The district court then conducted in front of the jury a preliminary examination as to Dr. Roberts' qualifications, during which Coloplast's counsel asked Dr. Roberts several questions about her methodology, before the court decided her testimony was admissible.

Dr. Roberts estimated the difference between the compensation Lestage would make but-for Coloplast's alleged retaliation and the compensation she will actually make. To

- 11 -

estimate those losses, Dr. Roberts took the following steps. First, she took Lestage's compensation in 2013 and 2014, the two years pre-leave, as a baseline of what Lestage's compensation would have been but-for the leave and account reassignment. She then took Lestage's 2017 and 2018 compensation, the two years post-leave, as a baseline of what Lestage's compensation will be in future years. She then assumed, based on data taken from Payscale.com regarding the compensation of similarly situated salespeople, that Lestage's compensation would grow at a rate of 1.04% per year. She took the difference between the without-leave and with-leave compensation to estimate the loss in each year for the next 20.4 years, the number of years she predicts Lestage will stay in the workforce. To estimate total loss, she discounted each year's damages to adjust for the likelihood that Lestage would leave Coloplast before that year.

Coloplast presented a competing expert witness, Frances McCloskey, who challenged Dr. Roberts' assumptions and methodology and concluded that Lestage had not suffered any economic loss.

After the close of Lestage's evidence, Coloplast moved for judgment as a matter of law under Rule 50. Fed. R. Civ. P. 50.

On the final day of trial, the district court reviewed its proposed jury instructions with counsel. As to causation, it instructed the jury that it could find for Lestage if she proved

that her participation in the qui tam suit was a "substantial motivating cause" of each adverse employment action. Coloplast did not object to this instruction.

The jury returned its verdict on April 12, 2019. The jury found that Coloplast had retaliated against Lestage by placing her on leave and assigning her inferior accounts upon her return and awarded Lestage $762,525.

After trial, Coloplast filed a motion for a new trial under Rule 59 on the grounds that the damages were excessive, that Dr. Roberts' testimony was inadmissible and prejudicial, and that the verdict was against the clear weight of the evidence. Fed. R. Civ. P. 59(a). Coloplast also renewed its motion for judgment as a matter of law under Rule 50(b). Fed. R. Civ. P. 50(b). Coloplast argued that no reasonable jury could find that Coloplast had placed Lestage on leave because of the qui tam action, that Lestage had suffered compensatory damages, that Lestage's account assignments on her return were materially adverse, or that the account assignments were retaliatory. The district court denied both motions.

As to the new trial motion, the district court explained that Dr. Roberts' testimony was admissible because Dr. Roberts was qualified and she had used a "straight-forward and rational method for approximating otherwise opaque sums." Any dispute between the parties concerned only the assumptions underlying the model, and

Coloplast had ample opportunity on cross-examination and during its own expert's testimony to expose any weaknesses in those assumptions. And since Dr. Roberts' testimony was admissible, Coloplast's other arguments failed as well.

As to the motion for judgment as a matter of law, the court held Lestage had presented sufficient evidence that she was placed on leave because of the qui tam suit and of damages -- both emotional and to her working relationships -- incurred while on leave. She had also presented evidence, which the jury could reasonably credit, that Hansen had "stymied" her return to the ABC account and assigned her sub-par accounts.

This appeal followed.

### III. Analysis

We first address the claim of error as to the jury instructions, followed by the motion for judgment as a matter of law and the claims of error as to Dr. Roberts' testimony.

A. <u>Jury Instructions</u>

For the first time on appeal Coloplast argues that the "substantial motivating factor" instruction was error and should have been a "but-for" instruction.

Because Coloplast did not object to this instruction below, we review this claim for plain error. <u>Teixeira</u> v. <u>Town of Coventry ex rel. Przybyla</u>, 882 F.3d 13, 16 (1st Cir. 2018) ("Unpreserved claims of instructional error . . . are reviewed

- 14 -

only for plain error." (citing United States v. Deppe, 509 F.3d 54, 58 (1st Cir. 2007))).  To demonstrate plain error, the party advancing the claim of error must establish "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. at 18 (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).  "'[P]lain error' is 'an indisputable error by the judge, given controlling precedent.'" Clukey v. Town of Camden, 894 F.3d 25, 33 (1st Cir. 2018) (quoting United States v. Ponzo, 853 F.3d 558, 582 (1st Cir. 2017)).  This circuit has demonstrated "marked reluctance to find plain error in civil cases."  Dimanche v. Mass. Bay Transp. Auth., 893 F.3d 1, 10 (1st Cir. 2018) (quoting Acevedo-Garcia v. Monroig, 351 F.3d 547, 570 (1st Cir. 2003)).  The plain error hurdle is especially high where an appellant relies on a claim of instructional error.  See Teixeira, 882 F.3d at 18.

The False Claims Act forbids employers from discriminating against an employee "because of" his or her protected conduct.  31 U.S.C. § 3730(h)(1); see also Guilfoile v. Shields, 913 F.3d 178, 187-88 (1st Cir. 2019).  The parties dispute the proper meaning of "because of."

In 2004, this circuit said in passing, and not in a holding, that an employee making a retaliation claim under the

- 15 -

False Claims Act must "show that 'the retaliation was motivated, at least in part, by the employee's engaging in protected activity.'" U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 239 (1st Cir. 2004), abrogated on other grounds by Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662 (2008) (quoting S. Rep. No. 99-345, at 35, reprinted in 1986 U.S.C.C.A.N. 5266, 5300).

Five years later, the Supreme Court decided Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009), and four years after that, University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 350-52 (2013). In Gross, the Court held that in order to make out a claim under the Age Discrimination in Employment Act, which forbids employers from discriminating against individuals "because of such individual's age," a plaintiff must show that age was the but-for cause of the employer's adverse employment action. 557 U.S. at 176; see also 29 U.S.C. § 623(a). In Nassar, the Court relied on Gross to hold that plaintiffs bringing claims under the anti-retaliation provision of Title VII -- which forbids employers from discriminating against an individual "because" he has challenged the employer's practices -- must prove that retaliation "was the but-for cause of the challenged employment action." 570 U.S. at 352.

Since Nassar and Gross, several circuits have applied the but-for standard in retaliation claims under the False Claims Act, reasoning that the statutory language is "materially identical" to that in Nassar and Gross. See Nesbitt, 945 F.3d at 1359-60 (collecting cases).[4] We agree that given the nearly identical statutory language, retaliation claims under the False Claims act must be evaluated under the but-for causation standard.

The instructions were error but they were not plain error because this circuit had never decided the question pre- or post-Nassar. Further, even after Nassar, several circuits continued to use a motivating factor test. See, e.g., Singletary v. Howard Univ., 939 F.3d 287, 293 (D.C. Cir. 2019). We add that it is difficult to fault the district court when Coloplast's trial counsel failed to call this issue to the court's attention either at the charge conference or immediately following the court's rendition of its jury instructions, even though these events transpired some six years after Nassar was decided. Under the circumstances, the error hardly can be said to be indisputable.

---

[4] Some circuits have continued to use a "motivating factor" standard, but we agree with the Eleventh Circuit's reasoning in Nesbitt that such a test is at odds with the Supreme Court's decisions in Nassar and Gross. See Nesbitt, 945 F.3d at 1360-62.

B. Rule 50 Motion for Judgment as a Matter of Law

We review de novo the denial of a post-trial motion for judgment as a matter of law. Analysis Grp., Inc. v. Cent. Fl. Invs., Inc., 629 F.3d 18, 22 (1st Cir. 2010). "Our review is weighted toward preservation of the jury verdict because a verdict should be set aside only if the jury failed to reach the only result permitted by the evidence." Id. (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006)) (internal quotation marks omitted) (alterations in original omitted). We review the evidence in the light most favorable to the non-moving party. Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012).

We assess False Claims Act retaliation claims under the McDonnell-Douglas burden-shifting framework. Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 30-31 (1st Cir. 2012); see also McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under this framework, to establish a prima facie case of retaliation, Lestage must show (i) that she engaged in protected conduct under the False Claims Act, (ii) that Coloplast knew she engaged in such conduct, and (iii) that Coloplast retaliated against her because of this conduct. Id. at 31; see also 31 U.S.C. § 3730(h)(1).

Once the plaintiff makes out a prima facie case, the burden shifts to the employer to articulate a non-retaliatory reason for the adverse employment action. Harrington, 668 F.3d at

31. This is merely a burden of production. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). If the employer produces evidence of a legitimate motive, the burden remains with the plaintiff to show "that the proffered reason is a pretext calculated to mask retaliation." Id. (citing Mesnick, 950 F.2d at 827 (1st Cir. 1991)). Courts then will look "to the record as a whole to determine whether there is sufficient evidence of 'pretext and retaliatory animus'" to sustain the jury verdict. Id. (quoting Mesnick, 950 F.2d at 827); see also id. at 33 ("'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer[]' can give rise to an inference of pretext." (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)) (alterations in original)).

As explained above, the protected conduct must have been the but-for cause of the adverse employment action. We apply the but-for standard to evaluate Coloplast's Rule 50 motion despite its failure to object to the district court's "substantial motivating factor" instruction below. See Boyle v. United Techs. Corp., 487 U.S. 500, 513-14 (1988); City of St. Louis v. Praprotnik, 485 U.S. 112, 120 (1988) (plurality opinion) ("[T]he failure to object to an instruction does not render the instruction the 'law of the case' for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict" (quoting City of Springfield, Mass. v. Kibbe, 480 U.S.

257, 264 (1987) (O'Connor, J., dissenting))); see also Fisher v. City of San Jose, 558 F.3d 1069, 1074 (9th Cir. 2009) (holding that in evaluating Rule 50 motions, appellate courts must "apply the law as it should be, rather than the law as it was read to the jury, even if the party did not object to the jury instructions." (quoting Pincay v. Andrews, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001) (internal quotation marks omitted))).

Coloplast argues evidentiary insufficiency as to the jury's conclusions (a) that Coloplast put Lestage on leave and assigned her particular accounts "because of" her protected conduct and (b) that the assignment of accounts following Lestage's return to Coloplast was an adverse employment action.

As to the first contention, we clear away Coloplast's meritless argument that the stipulation "Coloplast placed Ms. Lestage on a leave in response to Byram's request to have her removed from its accounts" forecloses Lestage from proving causation. The stipulation had to do with temporality and established only that Byram's letter set off the chain of events resulting in Lestage's leave. It was hardly a concession that there was no retaliation.[5]

---

[5] Stipulations are interpreted according to general contract law principles. Gomez v. Rivera Rodriguez, 344 F.3d 103, 121 (1st Cir. 2003). Contracts are interpreted to "effectuate the intent of the parties." VFC Partners 26, LLC v. Cadlerocks Centennial Drive, LLC, 735 F.3d 25, 29 (1st Cir. 2013). It strains credulity that Lestage would have stipulated that Byram's letter

- 20 -

Moving on, there was more than sufficient evidence that Lestage would not have been placed on leave but-for her protected action. A jury could conclude that Coloplast knew Byram's request was in retaliation for her qui tam suit and that the two companies' lawyers discussed it. Coloplast could have simply removed Lestage from the Byram account but chose not to do so. Instead it put her on leave, removing her from the premises and eliminating her physical and online presence, not even telling one of her accounts that she was gone.

Coloplast offered two justifications for putting Lestage on leave instead of just taking her off the Byram account. Coloplast says it put Lestage on leave because Byram's letter might have signaled "broader" issues with Lestage's performance. That explanation is undercut by at least two facts. First, Coloplast showed no evidence that it actually did any investigation into Lestage's work performance. Second, it did not bring Lestage back to work until after the qui tam suit was resolved.

A jury could also reject Coloplast's justification that she would not be able to meet her bonus targets if taken off the Byram account. Given the individualized and oft-changing nature of KAM bonus calculations, the fact that Coloplast was willing to simply pay Lestage an 100% bonus while she was on leave, and the

_____

alone would have caused Coloplast to place Lestage on leave. Such a stipulation would have hamstrung her case before it even began.

- 21 -

fact that accounts were moved between KAMs with some regularity, Coloplast could easily have found a satisfactory way to recalculate Lestage's bonus even if she were taken off the Byram account.

A reasonable jury could decide that Coloplast's reasons were pretextual, and thus conclude that the leave was retaliatory. See Harrington, 668 F.3d at 33.

Coloplast's second argument that the account assignments on Lestage's return were not adverse employment actions misunderstands the law. Employment action is materially adverse when it would "dissuade[] a reasonable worker" from engaging in protected activity. See Rodríguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico, 743 F.3d 278, 284 (1st Cir. 2014) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Examples of adverse employment actions include "a decrease in wage or salary . . . significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010) (quoting Lapka v. Chertoff, 517 F.3d 974, 986 (7th Cir. 2008) (discussing Title VII retaliation)). Our earlier discussion of the facts concerning the markedly lesser accounts she was given on return and the actions Coloplast deliberately failed to take disposes of this argument.

Finally, a jury could readily conclude that the account assignments were in retaliation for her filing the qui tam action.

Coloplast tried to justify its actions through Hansen's testimony. He testified that reassigning her to a different slate of accounts was not feasible based on existing client relationships and geography, but there was contrary evidence.

Coloplast's handling of the ABC account was particularly telling. A jury could conclude Coloplast had led ABC to complain that she had been tardy by not immediately informing ABC she was on leave and had no access to her email accounts to respond to ABC's inquiry. Indeed, such a remarkable failure to do so would be strong evidence of pretext.

Beyond that, Coloplast never attempted to return the ABC account to Lestage, despite its being reassigned several times after Wurgler's departure. And when the Cardinal account became available in Lestage's region, it was given to another KAM, despite Coloplast's asserted preference for assigning KAMs to accounts located near their homes.

There are many reasons Congress decided to protect persons who file qui tam actions from retaliation for doing so. Such protections encourage individuals to expose fraud. S. Rep. No. 110-507, at 26 (2008). The False Claims Act exists to protect the federal government from fraud. Id. at 6-7. The jury here supportably found on sufficient evidence against Coloplast on the retaliation claim.

C. <u>Claims Concerning Dr. Roberts' Expert Testimony</u>

Coloplast also requests a new trial on the grounds that the jury based its verdict on Dr. Roberts' allegedly unreliable testimony. Coloplast argues that the district court did not properly perform its gatekeeping role under <u>Daubert</u> v. <u>Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (2003). Coloplast also argues that Dr. Roberts' testimony should not have been admitted because it rested on flawed methodology and unrealistic assumptions.[6]

We review de novo the question of whether the district court performed its gatekeeping function. <u>Smith</u> v. <u>Jenkins</u>, 732 F.3d 51, 64 (1st Cir. 2013). Unless the district court entirely abdicated its gatekeeper role, we review the district court's decision to admit expert testimony for abuse of discretion. <u>Packgen</u> v. <u>Berry Plastics Corp.</u>, 847 F.3d 80, 85 (1st Cir. 2017).

The law on the district court's gatekeeper function under Rule 702 and <u>Daubert</u> is familiar and we have no need to recite it. 509 U.S. at 592-95. Coloplast's argument is without

---

[6] Coloplast argues that the years before Lestage's leave were unusually good years for Lestage and the years following her return were unusually bad years for her. Thus, assuming that her without-retaliation income would be similar to her best years while her with-retaliation income would be similar to her worst years resulted in Dr. Roberts overstating Lestage's damages. Coloplast next argues that Dr. Roberts' analysis should have used Coloplast-specific data to estimate Lestage's income and future income growth. Finally, Coloplast takes issue with Dr. Roberts projecting Lestage's loss forward over roughly twenty years.

merit. The district court did not fail to perform a gatekeeping function. How it chose to do so was within its discretion. See Lawes v. CSA Architects and Eng'rs LLP, 963 F.3d 72, 99 (1st Cir. 2020).

Dr. Roberts' model was reasonable and her assumptions were duly challenged on cross-examination and in McCloskey's testimony.[7] Coloplast's quarrel is with the jury's assessment of the evidence and is devoid of any merit. The district court properly denied a new trial on this ground.

---

[7] Dr. Roberts also offered explanations for each of her assumptions. See Cummings v. Standard Reg. Co., 265 F.3d 56, 65 (1st Cir. 2001) (rejecting defendant's challenges that plaintiff's expert used generic rather than company-specific data and based lost wages on "unusually high earning[] year" because during cross-examination, expert "offered sufficient explanations" for his choice of data).

As to why she used data only from 2013 and 2014 as Lestage's baseline without-retaliation compensation rather than including Lestage's lower-earning years in 2011 and 2012, Dr. Roberts explained that Lestage's income was growing at about 12% per year from 2011-2014, and thus that the data from 2011 and 2012 would unfairly understate her current earning capacity.

As to why Dr. Roberts assumed that Lestage's post-leave compensation would not revert to her previous performance, Dr. Roberts explained that Lestage's compensation was dependent on the way her target growth rates were set by Coloplast. Because Coloplast ultimately had control over Lestage's compensation, Dr. Roberts said she had no basis to assume that Lestage's income would go back to her pre-leave highs.

As to the duration of the twenty-year projection, Dr. Roberts explained that she adjusted the measure of damages each year based on the probability that Lestage would still be at Coloplast.

## IV. Conclusion

The judgment of the district court is <u>affirmed</u>. Costs are awarded to Lestage.